Thomas N. SCHIRO,
Defendant-Appellant,

v.

STATE of Indiana, Plaintiff-Appellee.

No. 1181S329.

Supreme Court of Indiana.

Aug. 5, 1983.

Michael C. Keating, John D. Clouse, Laurie A. Baiden, Evansville, for defendant-appellant.

Linley E. Pearson, Atty. Gen. of Indiana, Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for plaintiff-appellee.

PIVARNIK, Justice.

Defendant-appellant, Thomas N. Schiro, was convicted of Murder While Committing or Attempting to Commit Rape, Ind.Code § 35–42–1–1(2) (Burns Repl.1979), at the conclusion of a jury trial in Brown Circuit Court on September 12, 1981. The trial court sentenced Schiro to death. He now appeals.

Schiro raises seven errors on appeal, concerning:

1) whether the Indiana death penalty statute, Ind.Code § 35–50–2–9 (Burns Repl. 1979), is unconstitutional because it fails to provide for adequate review of death sentences;

2) whether the trial court erred in imposing the death penalty;

3) whether a statement given by Schiro was an involuntary custodial statement and should have been excluded from trial;

4) whether the master commissioner of Vanderburgh Circuit Court had authority to issue search warrants;

5) whether the trial court erred in excluding a letter written by the defendant on the issue of his insanity;

6) whether the trial court supplied the jury with all the necessary verdict forms; and,

7) whether the pre-sentence report contained improper information.

The evidence most favorable to the State reveals that the body of Laura Luebbehusen was discovered in her Evansville home on the morning of February 5, 1981. Laura's roommate, Darlene Hooper, and Darlene's ex-husband, Michael Hooper, discovered the body. Darlene had spent the previous night at Michael's apartment. The two found the home in great disarray, with blood covering the walls and floor. Laura's body was found near the door, her legs spread apart, and her slacks were pulled down around her ankles. The police were called and recovered a large broken vodka bottle, a handle and metal portions of an iron, a partially consumed bottle of wine, a pint bottle of vodka, and empty alcoholic beverage cans and bottles in the garbage.

Dr. Albert Venables testified as the pathologist who performed the autopsy on the victim. Dr. Venables found a number of contusions on the body but he stated that Laura Luebbehusen had been strangled to death. A number of wedge-shaped injuries on the head were most likely caused by a blunt instrument. Dr. Venables also found lacerations on one nipple and a thigh, and a tear in the vagina, all caused after the victim's death. A forensic dentist con-

firmed that the injury to the thigh was a human bite mark.

A few days after Laura Luebbehusen's body was discovered, her Toyota automobile was found about one block away from the Second Chance Halfway House. Defendant Schiro was a resident at the Halfway House, which tried to assist former criminals in finding employment and remove any obstacles that they face when released from prison. It also housed people who were sent there for treatment and counseling in lieu of sending them to prison from the local courts.

The director of the Halfway House, Ken Hood, asked a counselor to check the sign-in and sign-out sheets to see if any of the residents had been out at the time of the Luebbehusen murder. While the counselor was examining the sign-out sheets, Schiro approached him and asked if he could talk about something that was very "heavy." The counselor told Schiro to speak to Ken Hood. Schiro admitted to Hood that he had killed Laura Luebbehusen. Hood contacted the police and took Schiro down to the station.

Jimmy Wolff was Schiro's roommate at the Halfway House. Wolff testified that Schiro arrived at the room about 5:00 a.m., on February 5, 1981, the day Laura Luebbehusen's body was found. Schiro told Wolff he had to go downstairs and straighten things out so he would not get in trouble about being out all night.

After Schiro confessed to Ken Hood, the police searched his room and determined that the blood on a jacket found in the room was consistent with that of the victim, but not consistent with Schiro's blood. While in a holding cell in Vanderburgh County Jail, Schiro told another inmate that he had been drinking and taking Quaaludes the night of the killing, and had intercourse with the victim before and after killing her.

Mary T. Lee, Schiro's girlfriend, testified that shortly after the murder was committed, Schiro visited her in Vincennes and admitted that he killed Laura Luebbehusen. Schiro told Lee that he gained entrance to the victim's home on the pretext that his car had broken down. After pretending to use the telephone to call for assistance, Schiro asked if he could use the bathroom. He came out of the bathroom exposed but told Laura not to be alarmed because he was "gay". This story Schiro made up in order to gain the victim's confidence. Schiro further told Luebbehusen that some "gay" friends had bet him that he could not "get it on" with a woman and he just wanted to win the bet. Schiro and Luebbehusen talked about homosexuality and Luebbehusen told Schiro that she, too, was "gay". Darlene Hooper, Luebbehusen's roommate, had testified earlier that Laura was a practicing lesbian and that she had an aversion to men.

Schiro roamed through the house and came back with two dildoes and had Luebbehusen try to insert one into his anus. He found the experience too painful and told Luebbehusen he would make love to her instead. A dildo, identified at trial as the one taken from the house, was recovered in Vincennes. Mary Lee told the police where Schiro had disposed of it after showing it to her. After intercourse, Luebbehusen tried to leave but Schiro stopped her, dragged her back into the bedroom, and raped her. During this time the two had been drinking. When the liquor ran out, they left to go buy more and returned to the house. Schiro fell asleep but woke up when Luebbehusen again attempted to leave. Schiro forced her to remain and she fell asleep on the bed. While Luebbehusen slept, Schiro felt the urge to kill her, grabbed the vodka bottle, and beat her on the head until the bottle broke. He then beat her with the iron and when she resisted his attack, finally strangled her to death. Schiro then dragged Luebbehusen into another room, undressed her, and sexually assaulted the corpse.

I

Defendant Schiro's first argument concerns the constitutionality of the Indiana Death Penalty statute, Ind.Code § 35–50–2–9 (Burns Repl.1979). Schiro states specifically that the death penalty does not pro-

vide for any proportionality review of death sentences by this Court. According to Schiro, the term "proportionality review" requires that the sentence handed down by the trial court be compared to sentences imposed in similar circumstances. This, Schiro urges, would insure that the death penalty is not arbitrarily and capriciously applied. Since Ind.Code § 35–50–2–9 does not explicitly mandate this form of review and this Court has allegedly failed to engage in such review, Schiro believes that the death penalty statute is unconstitutional.

Schiro admits that two recent cases have upheld the constitutionality of the Indiana death penalty statute. *Williams v. State* (1982) Ind., 430 N.E.2d 759, *appeal dismissed* (1982) —— U.S. ——, 103 S.Ct. 33, 74 L.Ed.2d 47; *Brewer v. State* (1981) Ind., 417 N.E.2d 889, *cert. denied* (1982) —— U.S. ——, 102 S.Ct. 3510, 73 L.Ed.2d 1384. *See also Judy v. State,* (1981) Ind., 416 N.E.2d 95. Schiro also notes that the United States Supreme Court, in *Proffitt v. Florida,* (1976) 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913, found the Florida death penalty statute, which is nearly identical to our death penalty statute, to be constitutional. *Compare* Ind.Code § 35–50–2–9 (Burns Repl.1979) *with Fla.Stat.Ann.* § 921.141 (West Supp.1983). While conceding that the procedure under our statute may be constitutional, Schiro argues that the following passage from *Proffitt* indicates the Supreme Court's mandate of proportionality review in cases involving the death penalty:

> "The law differs from that of Georgia in that it does not require the court to conduct any specific form of review. Since, however, the trial judge must justify the imposition of death sentence with written findings, meaningful appellate review of each sentence is made possible, and the Supreme Court of Florida, like its Georgia counterpart, considers its function to be to '[guarantee] that the [aggravating and mitigating] reasons present in one case will reach a similar result to that reached under similar circumstances in another case.... If a defendant is sen-

tenced to die, this Court can review that case in light of the other decisions and determine whether or not the punishment is too great.' *State v. Dixon,* 283 So.2d 1, 10 (1973)."

428 U.S. at 250–51, 96 S.Ct. at 2966, 49 L.Ed.2d at 922.

Although Schiro has not raised this argument, and without going into great detail, we feel it is incumbent to note that this Court has consistently held that the death penalty does not violate the ban against cruel and unusual punishment, Article 1, § 16 of the Indiana Constitution. *Brewer, supra,* 417 N.E.2d at 894; *Adams v. State,* (1971) 259 Ind. 64, 74, 271 N.E.2d 425, 430, and cases cited therein. Similarly, the United States Supreme Court has held that the death penalty does not violate the Eighth Amendment of the United States Constitution. *Gregg v. Georgia,* (1976) 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; *Proffitt v. Florida,* (1976) 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; *Jurek v. Texas,* (1976) 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929.

This Court has comparatively analyzed the Florida death penalty statute, approved in *Proffitt, supra,* and our own statute at great length. *Brewer, supra,* 417 N.E.2d at 897; *see also Judy v. State,* 416 N.E.2d at 107. Both statutes require the following prerequisites before a sentence of death may be imposed and executed:

> "(1) A conviction of murder.
>
> (2) A hearing for purposes of determining the sentence to be imposed, separate from the trial at which the issue of guilt was determined.
>
> (3) In jury trials, a finding, by the jury, of at least one (1) of the aggravating circumstances enumerated in the statute.
>
> (4) In jury trials, a finding, by the jury, that mitigating circumstances, if any, are outweighed by the aggravating circumstances.
>
> (5) In jury trials, a recommendation by the jury, as to whether or not the death penalty should be imposed.

(6) A finding by the trial court of at least one (1) of the aggravating circumstances enumerated in the statute.

(7) A finding by the trial court that mitigating circumstances, if any, are outweighed by the aggravating circumstances.

(8) The completion, prior to carrying out the sentence, of an automatic expedited review of the imposed sentence by the Supreme Court of the State."

*Brewer,* 417 N.E.2d at 897.

We also felt in *Brewer* that Indiana is more restrictive than Florida in applying the death penalty. Indiana law requires that the sentencing hearing be before the same jury that tried the guilt issue, whereas Florida may, under certain circumstances, impanel a special jury for the hearing. *Id.* at 898. The standard of proof for a finding of at least one of the aggravating circumstances is beyond a reasonable doubt in Indiana, while Florida does not require a specified standard of proof. *Id.*

Still, regardless of the above distinctions, defendant Schiro would argue that under *Proffitt,* Indiana does not engage in a meaningful appellate review of death sentences. We disagree.

We interpreted the United States Supreme Court's holding in *Gregg v. Georgia, supra,* a companion case to *Proffitt,* to be that the death penalty may be applied ". . . if the circumstances of the offense and the character of the offender both warrant and if the procedures followed in making the determination are such as reasonably to assure that it was not done arbitrarily or capriciously." *Brewer, supra,* 417 N.E.2d at 897.

■ It is clear that the imposition of the death sentence under Ind.Code § 35–50–2–9 is based upon the nature and circumstances of the crime and the character of the offender being sentenced. *Judy, supra,* 416 N.E.2d at 105. Also, this Court has adopted a rule wherein it has exclusive jurisdiction of criminal appeals from judgments or sentences imposing death, life imprisonment,

or a minimum sentence of greater than ten years. Ind.R.App.P. 4(A)(7). Therefore, because of statewide jurisdiction over most criminal cases, and always over cases involving the death penalty or life imprisonment, we are confident that through continuous and exclusive review of such cases, no sentence of death will be freakishly or capriciously applied in Indiana.

In addition, rules adopted by this Court govern the appellate review of sentences:

"Rule I

AVAILABILITY—COURT

(1) Appellate review of the sentence imposed on any criminal defendant convicted after the effective date of this rule is available as this rule provides.

(2) Appellate review of sentences under this rule may not be initiated by the State.

(3) The Supreme Court will review sentences imposed upon convictions appealable to that Court; the Court of Appeals will review sentences imposed upon convictions appealable to the Court of Appeals.

Rule 2

SCOPE OF REVIEW

(1) The reviewing court will not revise a sentence authorized by statute except where such sentence is manifestly unreasonable in light of the nature of the offense and the character of the offender.

(2) A sentence is not manifestly unreasonable unless no reasonable person could find such sentence appropriate to the particular offense and offender for which such sentence was imposed."

Ind.R.App.Rev.Sen. 1 and 2.

■ In all cases involving the finding of aggravating circumstances, the sentencing judge must include a statement of the reasons for selecting the sentence he imposes. This enactment, Ind.Code § 35–4.1–4–3 (§ 35–50–1A–3) (Burns Repl.1979), reads as follows:

"SENTENCING HEARING IN FELONY CASES.—Before sentencing a person

for a felony the court must conduct a hearing to consider the facts and circumstances relevant to sentencing. The person is entitled to subpoena and call witnesses and otherwise to present information in his own behalf. The court shall make a record of the hearing, including:

> (1) A transcript of the hearing;
>
> (2) A copy of the presentence report; and
>
> (3) If the court finds aggravating circumstances or mitigating circumstances a statement of the court's reasons for selecting the sentence that it imposes."

The above statute insures that in all instances where the death penalty is applied, the trial court judge must submit written findings indicating the aggravating factors he found to be present in imposing a sentence of death. This will guard against the influence of improper factors at the trial level and will make sure that the evils of *Furman v. Georgia,* (1972) 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, "arbitrary and capricious application" of the death penalty, were not present in the sentencing decision.

Not only do the trial court judge's written findings facilitate meaningful appellate review, this review is guaranteed to be thorough and adequate since we have before us the entire record of the proceedings, not just the sentencing hearing. *Brewer, supra; Judy, supra.* Thus, examination of the record, plus the sentencing hearing and the trial court's findings, protects each individual's constitutional rights.

Therefore, because of procedure mandated by statute, codified by rules, and controlled by cited precedent,

> " . . . this Court can then meaningfully and systematically review each case in which capital punishment has been chosen, in light of other death penalty cases. Mandatory review by this Court, in each case, of the articulated reasons for imposing the death penalty, and the evidence supporting those reasons, assures 'consistency, fairness, and rationality in the evenhanded operation' of the death penalty statute. *Proffitt v. Florida, supra,*

428 U.S. at 259–60, 96 S.Ct. at 2970, 49 L.Ed.2d at 927. *See Gregg v. Georgia,* (1976) 428 U.S. 153, 194–95, 96 S.Ct. 2909, 2935, 49 L.Ed.2d 859, 886–87. *Cf. Woodson v. North Carolina,* [428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944], *supra; French v. State,* [266 Ind. 276, 362 N.E.2d 834], *supra.* The guidelines and procedures established by our constitution, statutes, and rules thus permit an 'informed, focused, guided, and objective inquiry' by all concerned into the appropriateness of capital punishment in a given case. Therefore, we find our death sentencing procedures to be consistent and in full compliance with those required by the United States Supreme Court in *Gregg v. Georgia* and *Proffitt v. Florida,* and thus not violative of the Eighth and Fourteenth Amendments to the United States Constitution."

*Judy, supra,* 416 N.E.2d at 108.

We find no constitutional infirmities in the death penalty statute nor in the review that automatically follows the imposition of such sentence.

## II

The next issue concerns the trial court's imposition of the death penalty. Defendant Schiro's argument may be divided into four sub-categories:

A. Whether Ind.Code § 35–50–2–9 permits a trial court to override a jury's recommendation that the death penalty not be imposed;

B. Whether the procedure established by Ind.Code § 35–50–2–9 places a defendant in double jeopardy;

C. Whether the imposition of the death penalty failed to conform to Ind.Code § 35–50–2–9; and,

D. Whether this Court, after reviewing the case at hand, should vacate the sentence of death.

## A.

Schiro's first dispute is with the following language found in Ind.Code § 35–50–2–9:

"(e) If the [death penalty] hearing is by the jury, the jury shall recommend to the court whether the death penalty should be imposed.

\* \* \* \* \* \*

(2) ...

The court shall make the final determination of the sentence, after considering the jury's recommendation, and the sentence shall be based on the same standards that the jury was required to consider. The court is not bound by the jury's recommendation."

Schiro argues that the use of the word "whether" indicates that the sole purpose of the jury at the death penalty hearing is to render a recommendation of death only if it is justified under the facts. The legislative intent would make a jury recommendation of *no* death penalty binding upon the trial court. If the jury did recommend a sentence of death, the legislature also intended that the trial court could behave as a safety valve by overriding such a recommendation and imposing a sentence of years. Thus, Schiro argues, while a trial court may override a recommendation of death, it may not impose the death penalty if the jury holds otherwise.

We wrote in *Foremost Life Ins. Co. v. Dept. of Ins.,* (1980) Ind., 409 N.E.2d 1092, 1095–96:

"In interpreting a statute we are to ascertain and give effect to the intent of the legislature. *State ex rel. Baker v. Grange,* (1929) 200 Ind. 506, 510, 165 N.E. 239, 240; *Ervin v. Review Bd.,* (1977) Ind.App. [173 Ind.App. 592], 364 N.E.2d 1189, 1192; *Abrams v. Legbrandt,* (1974) 160 Ind.App. 379, 388, 312 N.E.2d 113, 118; *Marhoefer Packing Co. v. Indiana Dept. of State Revenue,* (1973) 157 Ind. App. 505, 516, 301 N.E.2d 209, 214.

In determining the legislative intent, the language of the statute itself must be examined, including the grammatical structure of the clause or sentence in issue.... Further, a statute is to be examined and interpreted as a whole, giving common and ordinary meaning to words used in English language and not

overemphasizing a strict literal or selective reading of individual words. *Combs v. Cook,* (1958), 238 Ind. 392, 397, 151 N.E.2d 144, 147; *Abrams v. Legbrandt, supra.*"

██ The American Heritage Dictionary (1971 ed.) in its definition of "whether" says the word is "[u]sed in indirect questions to introduce one alternative: *We should find out whether the museum is open.*" Using the accepted definition of "whether", we find that under Ind.Code § 35–50–2–9, the jury is mandated to make a choice between the death penalty or no death penalty. Therefore, Schiro's argument, that the statute only allows the jury to recommend the death penalty, fails, and because of this, his assertion that the trial court may only reject death penalty recommendations also fails. We would also note that Schiro's premise (a recommendation against the death penalty is binding upon the trial court) thwarts legislative intent. Ind.Code § 35–50–1–1 (Burns Repl.1979) abolished the jury's role in determining or setting a sentence. *Debose v. State,* (1979) 270 Ind. 675, 676, 389 N.E.2d 272, 273. If we accept Schiro's argument, the trial court would be severely limited in imposing sentence under Ind.Code § 35–50–2–9 whenever a jury voted against the death penalty. Under the defendant's reasoning, the trial court would have no choice but to impose a term of years. Such action goes against the legislative intent of removing the jury's role in sentencing defendants. The jury plays an advisory role under Ind.Code § 35–50–2–9(e) and the trial court may properly override a jury's recommendation.

B

Schiro next argues that he was placed in double jeopardy because the trial court ignored the jury's recommendation and sentenced him to death. Having been given the chance to seek the death penalty before the jury, the State, Schiro urges, should not be given a second chance to litigate the same issues before the trial court. Schiro cites *Bullington v. Missouri,* (1981) 451 U.S.

430, 101 S.Ct. 1852, 68 L.Ed.2d 270 in support of his position.

The Double Jeopardy Clause of the Fifth Amendment provides,

"... that no person shall 'be subject for the same offense to be twice put in jeopardy of life or limb.' The Double Jeopardy Clause was made applicable to the states through the Fourteenth Amendment in *Benton v. Maryland,* (1969) 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707. The Clause has been held to embody three separate but related prohibitions: (1) a rule which bars a reprosecution for the same offense after acquittal; (2) a rule barring reprosecution for the same offense after conviction, and; (3) a rule barring multiple punishment for the same offense. *North Carolina v. Pearce,* (1969) 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656."

*Elmore v. State,* (1978) 269 Ind. 532, 533–34, 382 N.E.2d 893, 894.

■■■ Defendant Schiro's reliance on *Bullington, supra,* is misleading. Missouri law explicitly requires the jury, not the trial court, to impose the death penalty in cases tried before a jury. Mo.Ann.Stat. § 565.-006 (Vernon 1979). This involves a bifurcated proceeding where, after the defendant is convicted, the prosecution offers evidence in support of the death penalty. This hearing must be held before the same jury that convicted the defendant of murder. The jury must find at least one aggravating circumstance beyond a reasonable doubt and put its findings in writing. A jury's decision to impose the death penalty must be unanimous; if it cannot reach a decision, the alternative sentence of life imprisonment is imposed.

In *Bullington,* the defendant was convicted of murder, but the jury fixed his punishment at life imprisonment. While the defendant's motion for a new trial or judgment of acquittal was pending, the United States Supreme Court decided *Duren v. Missouri,* (1979) 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579. That case held that the Missouri law allowing women to be exempted from jury duty deprived a defendant of his right under the Sixth and Fourteenth Amendments to a jury drawn from a fair cross-section of the community. The trial court, relying on *Duren,* granted a new trial for defendant Bullington.

Defendant was again convicted of murder and the State sought the death penalty. The United States Supreme Court held that the second seeking of the death penalty, under the Missouri statute, violated the proscription against double jeopardy. The bifurcated proceeding requires the jury to determine whether the prosecution has proved its case. Analogizing the first jury's decision to impose life imprisonment to that of an acquittal (i.e., the jury could not find an aggravating circumstance beyond a reasonable doubt sufficient to impose a death sentence), and holding, of course, that an acquittal is absolutely final, the Supreme Court wrote that the prosecution is not entitled to another chance at the death penalty. 451 U.S. at 446, 101 S.Ct. at 1861–62, 68 L.Ed.2d at 283.

As the facts illustrate, *Bullington* was a unique decision that is clearly distinguishable from the situation presented here. Prior decisions held that the Double Jeopardy Clause did not prohibit the imposition of a harsher sentence on retrial, *North Carolina v. Pearce, supra,* but Bullington found an exception to that rule. The Supreme Court ruled that the Missouri sentencing hearing had the hallmarks of a trial on guilt or innocence. All issues are decided, reduced to written findings, and made binding since the jury's decision is the final determination of the sentence. In Indiana, the jury does not make a final determination of the sentence. It only releases an opinion of its recommendation, not an ultimate determination.

Schiro also argues that the jury's recommendation shows that the State failed to prove an aggravating circumstance beyond a reasonable doubt. This is not necessarily so. The statute does not require the jury to list its reasons for the recommendation. It could well be that a jury found the aggravating circumstance to be present, but felt it was outweighed by mitigating circum-

stances. The judge's determination is based on the same standards as the jury's recommendation and he determines whether the aggravating circumstances has been proved beyond a reasonable doubt. His findings are put in writing so that we may adequately review them on appeal. The judge's determination was the completion of a single trial process of which the jury recommendation was only an intermediate stage. We find no error in the procedure used by the trial court in rejecting the jury's recommendation.

C

The original findings in this action did not set out clearly and properly the trial court's reasons for imposing the death penalty. We ordered the trial court to make written findings in this case, setting out the aggravating circumstance proved beyond a reasonable doubt and the mitigating circumstances, if any, as specified in Ind.Code § 35–50–2–9. At the same time we afforded defendant Schiro the opportunity to file a brief contesting the *nunc pro tunc* entry of the trial court. The State was given the opportunity to oppose the defendant's brief. In the brief, Schiro argues that the *nunc pro tunc* entry is inappropriate; that he has been twice placed in jeopardy; and that the *nunc pro tunc* entry does not comply with Ind.Code § 35–50–2–9.

The State counters Schiro's first argument by contending that the *nunc pro tunc* entry simply restates the trial court's findings so that they conform with the requirements of Ind.Code § 35–50–2–9. A *nunc pro tunc* entry is

" 'an entry made now of something which was actually previously done, to have effect as of the former date.' *Perkins v. Hayward,* (1892) 132 Ind. 95, 31 N.E. 670. Such entries may provide a record of an act or event of which no reference at all is made in the court's order book, as was the case in *Neuenschwander v. State,* (1928) 200 Ind. 64, 161 N.E. 369, and *Warner v. State,* (1924) 194 Ind. 426, 143 N.E. 288, or they may serve to change or supplement an entry already existing in

the order book as was the case in *Apple v. Greenfield Banking Co.,* (1971) 255 Ind. 602, 266 N.E.2d 13, and *Perkins v. Hayward, supra.* Such entries must be based upon written memoranda, notes, or other memorials which (1) must be found in the records of the case; (2) must be required by law to be kept; (3) must show action taken or orders or rulings made by the court; and (4) must exist in the records of the court contemporaneous with or preceding the date of the action described. *Blum's Lumber & Crating, Inc. v. James et al.,* and *State ex rel. Baertich v. Perry County Council et al.,* (1972) 259 Ind. 220, 285 N.E.2d 822; *O'Malia v. State,* (1934) 207 Ind. 308, 192 N.E. 435; *Schoonover v. Reed,* (1879) 65 Ind. 313; *Pittsburgh etc. R. Co. v. Lamm,* (1916) 61 Ind.App. 389, 112 N.E. 45."

*Stowers v. State,* (1977) 266 Ind. 403, 410–11, 363 N.E.2d 978, 983. There has been precedent for *nunc pro tunc* entries in death penalty cases. In *Judy v. State, supra,* the record of the proceedings did not contain the written findings required in death penalty cases. The case was remanded and the trial court was instructed to enter written findings made *nunc pro tunc* effective the date of the sentencing hearing. Such actions are also common in cases involving enhanced sentences where the trial court does not comply fully with the mandate of *Gardner v. State,* (1979) 270 Ind. 627, 388 N.E.2d 513. *See e.g., Alleyn v. State,* (1981) Ind., 427 N.E.2d 1095. We request this specificity upon review so that

"we [may] fulfill our responsibility to review the trial court's exercise of its judicial discretion. The trial court's statement is important also because it further serves to enlighten the defendant and the community as to the trial court's reasons for the imposition of an enhanced sentence, thereby greatly bolstering the public's confidence in the fairness and justice of our State's judicial process."

*Spinks v. State,* (1982) Ind., 437 N.E.2d 963, 968.

In a recent case, *Eddings v. Oklahoma,* (1982) 455 U.S. 104, 102 S.Ct. 869, 71

L.Ed.2d 1, the United States Supreme Court remanded a death penalty case to the Oklahoma Court of Criminal Appeals. The trial court had refused to consider, as a matter of law, the defendant's character and record of family history as a possible mitigating factor. The Supreme Court ruled that this was error and vacated the death sentence but at the same time remanded the case to the Oklahoma courts. It was made very clear that the Supreme Court would not weigh this evidence of family background; that was the role for the Oklahoma courts. Thus, the death penalty could be reinstated on remand if the Oklahoma courts found that the defendant's background was not sufficient to outweigh imposition of the death sentence.

 We also found it proper to remand this cause and order the trial court to comply fully with the death penalty statute. We did not demand a new decision; instead, we simply requested that the trial court provide its reasons for the harsher sentencing and these particular findings must be in the proper form. Only then may we adequately review the imposition of the death sentence. Ind.Code § 35–50–2–9 lists only nine aggravating circumstances which may be used in seeking the death penalty. In this case, it appears that the trial court listed wrongly as aggravating circumstances its counter-arguments to any possible mitigating circumstances available to the defendant. Thus, to ensure fairness to both sides, and to make certain that proper considerations were utilized by the trial court in imposing sentence, we felt that remanding the case so that the written findings conform with the death penalty statute was the proper remedy.

 In support of his double jeopardy argument, defendant Schiro again cites *Bullington, supra,* Issue IIB. Without going into great detail, we determined above that *Bullington* is not controlling on this matter. Here a judgment of death had been entered. All we requested was that the trial court put its findings in the proper form. No new determination of sentence was made, no new evidence was presented, and no reweighing of the facts took place. We fail to see how double jeopardy attached by remanding this cause for compliance with Ind.Code § 35–50–2–9.

 Finally, Schiro argues that the *nunc pro tunc* entry does not comply with Ind.Code § 35–50–2–9 for two reasons: first, the trial court did not take the jury's recommendation into consideration; and, second, that the trial court did not exercise any discretion but instead felt that the death sentence had to be mandatorily imposed.

Ind.Code § 35–50–2–9(e) reads that the "[trial] court shall make the final determination of the sentence, after considering the jury's recommendation . . . ." Schiro insists that the trial court failed to do this. An examination of the *nunc pro tunc* entry, however, reveals just the opposite. The trial court specifically stated that the jury had unanimously recommended that the death penalty not be imposed. Thus, the trial court was aware and cognizant of the jury's recommendation. Later, the trial court stated that the defendant continually "rocked" only in the jury's presence, and that this "fact may well have influenced and misled the jury in its recommendation." It is evident that the trial court did consider the jury's recommendation.

Schiro also takes issue with a passage in the *nunc pro tunc* entry. After carefully weighing all the mitigating circumstances, the trial court stated that "the death sentence is required by the Statutes of the State of Indiana. This Court has no choice but to follow the law." Schiro argues that this makes for a mandatory imposition of the death penalty.

The imposition of a mandatory death penalty is contrary to constitutional considerations. *Woodson v. North Carolina,* (1976) 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944; *French v. State,* (1977) 266 Ind. 276, 362 N.E.2d 834. The entire *nunc pro tunc* entry illustrates that the trial court felt that the requirements of the law, which calls for the death penalty only after strict consideration of all possible mitigating circumstances, had

been satisfied. Perusal of the record shows that after careful consideration, the death penalty was deserved and justified. The language of the trial court may appear awkward but nowhere has the trial court or this Court attempted to apply anything resembling a mandatory death penalty. The *nunc pro tunc* entry complies with Ind.Code § 35–50–2–9.

### D

In this last sub-paragraph of Issue II, Schiro urges this Court to overturn the death penalty. The main basis for his contention is that the trial court rejected the jury's recommendation that no death penalty be imposed. Schiro believes this Court should impose a stricter standard of review in situations where the trial court and jury disagree about the imposition of a sentence of death.

It is true that in *Gregg v. Georgia, supra,* the United States Supreme Court spoke of the important society function fulfilled by jury sentencing. 428 U.S. at 181–82, 96 S.Ct. at 2929, 49 L.Ed.2d at 879. But on the same day, in a companion case, *Proffitt v. Florida, supra,* the Supreme Court pointed out that it

> "has never suggested that jury sentencing is constitutionally required. And it would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced at sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases."

428 U.S. at 252, 96 S.Ct. at 2966, 49 L.Ed.2d at 923.

In Issue I, we discussed the great care and scrutiny that goes into the review of all death penalty cases. While we agree that a jury plays a very important and necessary role in our judicial system, we are loath to institute a higher degree of scrutiny in situations where the trial court and jury disagree about the imposition of the death penalty. Trial courts are presumed to know and understand the law. We have

as great a confidence in the trial court's function in our judicial system as we do in the function of the jury. It may be that a jury which is to be involved in a capital case only once would be reluctant to impose this most severe form of punishment. This is not to say that all juries would be reluctant to do so, nor that trial courts are more callous and more inclined to impose a sentence of death. Rather, the trial court, with more experience in the criminal system, has better knowledge with which to compare the facts of this case with that of other criminal activity. This should result in greater consistency in sentencing. Furthermore, this Court, using the existing standards for appellate review of sentences, will ensure that the death penalty is not imposed where it is unreasonable to do so. We will not engage in a different standard of review where jury and trial court disagree.

After disposing of the defendant's four separate sub-categories, we now turn to examine whether the sentence of death is appropriate. The transcript of the sentencing hearing and the trial court's written findings show that the court found that Schiro intentionally killed Laura Luebbehusen while committing or attempting to commit rape. After examining the record, we agree with the trial court's findings. Mary Lee and Dr. Frank Osanka recounted the events as told to them by Schiro. Schiro saw the victim a couple of times prior to the day of the murder. He made up his mind that he would rape her and perform his "ritual." After work, Schiro pretended that his car broke down and thus gained access to Luebbehusen's apartment by requesting assistance. Once inside, Schiro persuaded her that he was homosexual but they eventually had intercourse. Dr. Osanka said he was not certain but he was almost positive that the victim was coerced into such activity. Schiro then attempted to get the victim in a comatose or drowsy state by having her consume alcohol and pills. One of his fantasies was to work in a funeral parlor and make love to the bodies of dead women. Sometime during this

process Schiro fell asleep but awakened when the victim tried to escape. He grabbed her, pulled her back in, and raped her. Later they left to purchase some alcohol and then returned, at which time Schiro raped the victim again.

Schiro fell asleep on the couch but awoke when the victim again tried to escape. This time Luebbehusen was fully dressed. Schiro forced her to lie down on the bed beside him. He believed that she fell asleep or passed out. At that point he decided to kill her. Grabbing a vodka bottle, he smacked it against her head and it broke. Luebbehusen started to protest but Schiro grabbed an iron and continued to beat her. Finally, he grabbed the victim around the neck and strangled her. Schiro then began his "ritual." He dragged the corpse into another room, undressed it, and sexually and sadistically assaulted it.

As for the mitigating factors, the trial court did not find any. The court found that the defendant had been engaged in numerous instances of prior criminal conduct. Psychiatrists testified to Schiro's numerous rapes and other criminal deviate conduct. Mary Lee testified about Schiro's sadistic assaults on her child. Another witness testified that Schiro raped her in the presence of her child. Although the defendant related instances of sexual perversion, sadism, necrophilia, exhibitionism, and voyeurism, both of the court-appointed psychiatrists felt that Schiro was in good contact with reality. Both men testified that Schiro was not insane, showed no remorse, was violent and sadistic, and both thought him to be a danger to the community.

The trial court said the defendant attempted to conceal his crime, thereby showing his appreciation for the wrongfulness of his conduct. The court also thought Schiro tried to delude the jurors into thinking he was mentally unstable by rocking back and forth only in their presence. The trial court failed to find that Schiro's age, twenty years, was a mitigating factor.

■ We find that with the submission of the *nunc pro tunc* entry the trial court properly followed the required procedures in imposing the death sentence. The record justifies the finding of the aggravating circumstances that Thomas Schiro intentionally killed Laura Luebbehusen. Although the record shows that Schiro engaged in bizarre sexual perversions at an early age and for some length of time, we also find that the evidence, as attested to by psychiatrists, indicated he could have conformed his conduct to the law. Such pitiful behavior should not serve as an excuse for the atrocious acts in this matter. The facts in the record, which show the horrifying nature of this rape/murder and the character of this offender, and the compliance of the trial court with the procedures of Ind.Code § 35–50–2–9, lead us to conclude that the death penalty was not arbitrarily or capriciously applied, and is reasonable and appropriate. The trial court is affirmed in the imposition of the death penalty.

### III

Schiro argues on appeal that the statement he gave to Ken Hood, in which he admitted killing Laura Lubbehusen, should have been suppressed at trial. He claims that his confession was the result of a custodial interrogation and Ken Hood failed to give *Miranda* warnings prior to Schiro's statement. Schiro also argues that the illegal statement taints all evidence seized as a result of his confession. Such evidence would include Mary Lee's testimony because the police were directed to her through the statement, and objects taken from Schiro's room. Schiro feels that this evidence should have been excluded from the trial.

■ *Miranda* warnings, *Miranda v. Arizona,* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, do not have to be given in all interrogations. In *Johnson v. State,* (1978) 269 Ind. 370, 375–76, 380 N.E.2d 1236, 1240, this Court wrote:

> "It is settled that the procedural safeguards of *Miranda* only apply to what the United States Supreme Court has termed 'custodial interrogation.' *Oregon v. Mathiason* (1977) 429 U.S. 492, 97 S.Ct. 711,

50 L.Ed.2d 714; *Bugg v. State,* (1978) Ind., [267 Ind. 614] 372 N.E.2d 1156, 1158. Custodial interrogation refers to questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Mathiason, supra,* 429 U.S. at 494, 97 S.Ct. at 711, 50 L.Ed.2d at 719. The concept of custodial interrogation does not operate to extend the *Miranda* safeguards to spontaneous voluntary statements, i.e. statements which are either not made in response to questions posed by law enforcement officers while the defendant is in custody, *Bugg v. State, supra,* or statements which are made before the officers are given an opportunity to administer the *Miranda* warnings. *New v. State* (1970) 254 Ind. 307, 259 N.E.2d 696."

Schiro argues that Ken Hood was a law enforcement officer who interrogated him in Hood's office. The State strongly argues that Hood, as director of the Second Chance Halfway House, was not a law enforcement officer and no interrogation took place. Both parties have cited other jurisdictions in support of their view on Hood's law enforcement status. We do not find it necessary to determine whether Hood was a law enforcement officer, although Hood stated that he had no ties to any law enforcement agency, was not a sworn peace officer, and was not responsible for the investigation of any criminal activity. From the facts presented in this case, our first point of inquiry is to determine whether a "custodial interrogation" took place. Cases from both the United States Supreme Court and this Court have stated that *Miranda, supra,* does not apply outside the inherently coercive custodial interrogation for which it is designed. *Roberts v. United States,* (1980) 445 U.S. 552, 560, 100 S.Ct. 1358, 1364, 63 L.Ed.2d 622, 631; *Smith v. State,* (1981) Ind., 419 N.E.2d 743, 747. We examine all the facts to determine whether custodial interrogation took place.

A perusal of the record covering the suppression hearing and Hood's testimony at trial reveals the following: On the day in question, Schiro approached his work release counselor, a Mr. Williamson, and said that he had something "heavy" to discuss. Williamson was busy checking the sign-in, sign-out sheets to see whether any of the residents were out of the building during the time Laura Lubbehusen was murdered. Williamson was doing this under Hood's direction. Hood stated that while he did not think any of the residents were involved in the murder, he was afraid adverse publicity might arise because the victim's car was found near the Second Chance Halfway House. Therefore, he wanted to counter any possible bad publicity by showing that all the residents were in the facility when the crime occurred. Williamson thought Schiro's problem concerned his alcoholism and said that if it was serious, Schiro should go see Hood. Williamson called Hood and told him Schiro was on his way to discuss a problem.

Hood stated that he and the staff are strictly concerned in treating the individual resident's problems. In fact, Schiro had been in his office earlier that day and they discussed transferring him to another facility where Schiro could receive better treatment for his drinking problem. When Schiro arrived, Hood said he seemed nervous and upset but did not appear to be under the influence of alcohol or drugs. After ascertaining that Schiro's alcoholism was not the reason for this conversation, Hood started asking Schiro general questions. Hood felt that Schiro wanted to talk but appeared uncertain as to what he wanted to discuss. Hood thought that some general questions might calm him down. Although Hood said every indication was against it, he finally asked Schiro if he drove the victim's car and parked it near the facility. When Schiro nodded affirmatively, Hood told him he did not believe him because the records indicated that Schiro had been in the facility when the crime took place. Schiro said that the night watchman or manager had falsified the sign-in sheet. Still disbelieving, Hood asked some more questions about the murder. When Schiro mentioned that he worked near the victim's

apartment, and Hood knew this to be true, Hood finally believed Schiro was responsible for the murder. Flabbergasted, Hood telephoned a judge for assistance. Schiro's attorney was in the judge's chambers and told Schiro to avoid saying anything about the crime. Hood then escorted Schiro to the police station.

We do not find that these facts show a custodial interrogation took place. Schiro voluntarily wanted to talk to someone about this crime. He was not the object of suspicion by Hood or anyone else, and Hood was only talking to Schiro upon Schiro's request. Schiro argues that under the rules of the facility, he could not leave unless he signed out on authorized business. Thus, he feels that he was in custody anywhere in the building. Hood stated that the residents could move about the facility at their leisure, stroll the grounds, and one door was always left unlocked. Regardless, Hood also said that he was not keeping Schiro in his office and he was free to leave at any time. Schiro was never placed in physical custody or restrained in any way. Schiro approached Hood, not vice versa. We fail to see that Schiro was coerced, either blatantly or inherently, into making a confession. There was no need for *Miranda* warnings from Hood.

Due to the disposition of the above issue, we also hold that Schiro's confession does not taint all evidence seized as a result of his statement. Therefore, Mary Lee's testimony and evidence taken from Schiro's room were properly admitted at trial.

### IV

Defendant Schiro argues that the search warrant issued by Maurice O'Connor, acting as Master Commissioner of the Vanderburgh Circuit Court, is invalid due to this Court's decision in *State ex rel Smith v. Starke Circuit Court,* (1981) Ind., 417 N.E.2d 1115. Due to the alleged defective nature of the search warrant, which was State's Exhibit 45, Schiro argues that all evidence seized because of the search warrant, such as his blood-stained coat, should not have been introduced at trial.

Defendant Schiro is in error on this issue. *State ex rel. Smith v. Starke Circuit Court* dealt with statutes providing for appointment of commissioners by circuit courts of Starke, Vanderburgh, and St. Joseph counties. The opinion was handed down on March 23, 1981, and we held that the holding shall have only prospective application and shall apply to or affect only those cases which had not yet reached final judgment or had not yet had a ruling on the motion to correct errors. *Id.,* 417 N.E.2d at 1124. The search warrant in this cause was issued in February, 1981, and the trial began in September, 1981; therefore, Schiro is correct in stating that his pending trial fell within the ambit of the opinion's prospective application. However, we declared only the following sections to be unconstitutional: Ind.Code § 33–4–1–74.4(b); 33–4–1–82.2(b); and 33–4–1–75.1(c) (Burns Supp. 1980). Those sections gave the master commissioner power to exercise full jurisdiction over any probate matters, civil matters, or criminal matters, but we did not hold the power to issue search warrants to be unconstitutional. The statute for Vanderburgh county states in pertinent part that the "master commissioner may conduct preliminary hearings in criminal matters and issue search warrants and arrest warrants and fix bond thereon, and he may enforce court rules." Ind.Code § 33–4–1–82.2(a) (Burns Supp.1982). The search warrant was properly issued and evidence seized was properly introduced at trial.

### V

Dr. Walter Abendroth was called by the State to testify about defendant Schiro's mental state. Dr. Abendroth had been treating Schiro prior to the murder. Most of this treatment dealt with Schiro's problem with alcohol and drugs. On cross-examination, the defense attempted to introduce a letter, allegedly written by Schiro, which Mary Lee delivered to Dr. Abendroth. The State objected on lack of foundation of Abendroth's ability to authenticate the letter as one written by Schiro. The trial court sustained the objection. De-

fendant Schiro argues that the objection should have been overruled because the exhibit was relevant, material, and competent evidence, and was not in violation of any rules of evidence.

In the appellate brief, Schiro also argues that the letter should have been admitted because a plea of insanity "opens wide the door to all evidence relating to the defendant and his environment." *Wilson v. State,* (1966) 247 Ind. 454, 461, 217 N.E.2d 147, 151. This is true but exhibits must be sufficiently identified to be admissible in evidence. *D.H. v. J.H.,* (1981) Ind.App., 418 N.E.2d 286; *Leslie v. Ebner,* (1918) 67 Ind. App. 32, 118 N.E. 829. A letter alleged to have been received from a particular source is not admissible until its authenticity, identity, and genuineness have been sufficiently shown. 13 I.L.E. *Evidence* § 163 (1959); 29 Am.Jur.2d *Evidence* § 879 (1967).

Dr. Abendroth said he could recognize Schiro's handwriting, probably because he received three or four prior letters from Schiro, but never explained how he knew the letters were actually written by Schiro. Defense counsel never asked Abendroth if he saw Schiro write the letters or if Schiro personally delivered them and said they were written by him. This lack of authentication was the basis for the trial court sustaining the objection to the letter's introduction. Mary Lee, not Schiro, delivered the letter to Dr. Abendroth. Due to this fact, defense counsel could have had Mary Lee authenticate the letter when she testified later in the trial, but defense counsel failed to do this. We find that in addition to the lack of authenticity, any alleged error on this issue has been waived because defense counsel failed to resubmit the evidence when Mary Lee took the stand.

## VI

When the jurors were ready to begin their deliberations, the trial court gave them the following verdict forms:

1) Guilty of Murder as charged in Count I

2) Guilty of Murder/Rape as charged in Count II

3) Guilty of Murder/Deviate Conduct as charged in Count III

4) Guilty of Voluntary Manslaughter

5) Guilty of Involuntary Manslaughter

6) Not guilty

7) Not responsible by reason of insanity

8) Guilty of Murder but mentally ill

9) Guilty of Voluntary Manslaughter but mentally ill

10) Guilty of Involuntary Manslaughter but mentally ill.

The Guilty of Murder/Rape verdict was returned on September 12, 1981. The jury was allowed to go home and was instructed to return on September 15 for the penalty phase of the trial. Before the jury returned on the 15th, defense counsel made a motion to reject the verdict because two verdict forms were not submitted to the jury. After some discussion this motion was denied and the penalty phase of the trial began. On appeal, defendant Schiro argues that it was reversible error to omit the following forms: Guilty of Murder while committing and attempting to commit rape, but mentally ill; and Guilty of Murder while committing and attempting to commit Criminal Deviate Conduct but mentally ill.

In *Himes v. State,* (1980) Ind., 403 N.E.2d 1377, 1382, this Court wrote:

"We have previously held that when the jury was permitted to retire without sufficient forms of verdict, the number of forms submitted cannot be considered as reversible error where the record does not show that the accused tendered or requested any other forms. *Bowman v. State,* (1934) 207 Ind. 358, 192 N.E. 755; *Kirkland v. State,* (1956) 235 Ind. 450, 134 N.E.2d 223."

An examination of the hearing on the September 15th motion reveals that the trial court originally raised the question of insufficient verdict forms. At that time defense counsel did not request that any additional verdict forms be submitted but apparently changed his mind a few days

later. Thus, we find no reversible error because defendant failed to request any other verdict forms when the situation was first brought to his attention. *Himes, supra.*

The trial court also mentioned that Defendant's Instruction 3 informed the jury that the verdict of guilty but mentally ill was submitted to them on all counts of the information. Thus, the jury was informed that the mentally ill verdict applied to Guilty of Murder/Rape and Guilty of Murder/Deviate Conduct, as well as Guilty of Murder. Defendant has failed to show any prejudice on this issue. *Johnson v. State,* (1982) Ind., 432 N.E.2d 403, 405. There is no reversible error on this issue.

### VII

■ Finally, defense counsel moved to strike a portion of the presentence report which listed certain factors as "aggravating." Defendant Schiro feels that this conclusory language invades the province of the trial court in determining the existence of aggravating and mitigating circumstances under Ind.Code § 35–50–2–9. The presentence report recommended that Schiro receive a severe penalty. Defendant moved to have the recommendation section removed from the report, but was overruled by the trial court, although it did delete one sentence which characterized various factors as aggravating circumstances.

Ind.Code §§ 35–4.1–4–9, –10 (35–50–1A– 9, –10) (Burns Repl.1979) provide for the making of a pre-sentence report in order to assist the judge in sentencing. Some factors the probation officer may take into account include "the convicted person's history of delinquency or criminality, social history, employment history, family situation, economic status, education and personal habits." Ind.Code § 35–4.1–4–10 (35– 50–1A–10). Furthermore, this Court wrote in *Lottie v. State,* (1980) Ind., 406 N.E.2d 632, 640:

"[T]he Court of Appeals held [in *Halligan v. State,* (1978) 176 Ind.App. 472, 375 N.E.2d 1151] that the pre-sentence investigation and report may include any matter which the probation officer deems relevant to the question of sentence. These matters obviously could be in favor of or against the defendant and are presented in the report as a finding or an opinion of the probation officer. The defendant is, of course, given the opportunity to rebut any and all of these matters.... The United States Supreme Court has stated that it is essential for a sentencing judge to be as well informed as possible concerning the defendant's life and characteristics in order to select an appropriate sentence. The Court further stated that '... modern concepts individualizing punishment have made it all the more necessary to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial.' *Williams v. New York,* (1949) 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337, 1343."

Schiro was given the opportunity to refute the allegations made in the report. It appears that Schiro had a "personality conflict" with the probation officer because she was a woman and he also contested portions of the report wherein he admitted making false statements in order to receive leniency for earlier crimes. The sentencing judge listened patiently to everything Schiro had to say and then gave his decision. Trial court judges are presumed to know and understand the laws of this state. The mere fact that the probation officer labeled certain factors as "aggravating" does not imply that the judge would automatically assume that this is so. As the record shows, the trial judge did scratch the last reference to "aggravating factors." Defendant Schiro has not shown that any portion of the pre-sentence report was illegal or that it should not have been presented to the trial judge.

We affirm the trial court in all matters and in the imposition of the death penalty. This cause is remanded to the trial court for the purpose of setting a date for the death sentence to be carried out.

GIVAN, C.J., and HUNTER, J., concur.

DeBRULER, J., concurring and dissenting with separate opinion.

PRENTICE, J., concurring and dissenting with separate opinion.

DeBRULER, Justice, concurring and dissenting.

Following the jury sentencing hearing, the jury, after deliberating for one hour, returned a unanimous recommendation that the death penalty not be imposed. Two weeks later at the judge sentencing hearing, the judge overrode that recommendation and sentenced appellant to die. The conviction should be affirmed, but several independent legal grounds exist which require the penalty of death to be vacated.

## I.

Upon considerations going to the meaning and spirit of the Double Jeopardy Clause of the Fifth Amendment and the like provision of the Indiana Constitution, Art. 1, § 14, a sentencing judge cannot be permitted to override a jury recommendation of no death penalty arrived at pursuant to the death sentence statute, Ind.Code § 35–50–2–9. A jury verdict of not guilty on the issue of guilt or innocence is absolutely beyond the authority of judges to override. *Fong Foo v. United States,* (1962) 369 U.S. 141, 82 S.Ct. 671, 7 L.Ed.2d 629. This fixed and unyielding characteristic of the jury verdict of acquittal exists by reason of the pronouncements of courts that the Double Jeopardy Clauses require it to exist. No state statute or act of Congress can change this. Only a constitutional amendment could do so. Justice Blackmun for the United States Supreme Court in *Bullington v. Missouri,* (1981) 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270, in referring to the immutability of the verdict of acquittal states:

"The values that underlie this principle, stated for the Court by Justice Black, are equally applicable when a jury has rejected the State's claim that the defendant deserves to die:

'The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent, he may be found guilty.' *Green v. United States,* 355 U.S. [184], at 187–188, 78 S.Ct. [221], at 223–224 [2 L.Ed.2d 199].

See also *United States v. DiFrancesco,* 449 U.S. [117], at 136, 101 S.Ct. [426], at 437 [66 L.Ed.2d 328]. The 'embarrassment, expense and ordeal' and the 'anxiety and insecurity' faced by a defendant at the penalty phase of a Missouri capital murder trial surely are at least equivalent to that faced by any defendant at the guilt phase of a criminal trial. The 'unacceptably high risk that the [prosecution], with its superior resources, would wear down a defendant,' *id.,* at 130, 101 S.Ct., at 433, thereby leading to an erroneously imposed death sentence, would exist if the State were to have a further opportunity to convince a jury to impose the ultimate punishment. Missouri's use of the reasonable doubt standard indicates that in a capital sentencing proceeding, it is the State, not the defendant, that should bear 'almost the entire risk of error.' *Addington v. Texas,* 441 U.S. [418], at 424, 99 S.Ct. [1804], at 1808 [60 L.Ed.2d 323]." 451 U.S. at 445–446, 101 S.Ct. at 1861–1962.

That court went on to announce that the sentencing proceeding before the Missouri jury was like the trial on the question of guilt or innocence, and that as a consequence thereof, a resultant jury rejection of the death penalty, by reason of the Double Jeopardy Clause has the same immutable characteristic as the jury verdict of not guilty. Appellant contends that the jury recommendation against imposition of the death penalty under the Indiana death sentence statute should be treated in like manner, and that therefore the sentencing

judge in making a final determination of the sentence can have no power to override it and impose death. I agree. The recommendation of the jury against death should have the force of an acquittal of the death sentence, and a recommendation that the death penalty be imposed should have the same force as a verdict of guilty.

Pursuant to the statute the jury reconvenes in court for the sentencing hearing. It is presided over by the judge. The defendant is present with his counsel and the state by its trial prosecutor. Evidence is presented in an adversarial setting. The jury receives the instruction from the court regarding the issues presented which include the question of whether an aggravating circumstance exists and whether it is of such a character as not to be outweighed by mitigating circumstances. The burden is upon the state to prove the aggravating circumstance beyond a reasonable doubt. The lawyers make final arguments to the jury. The jury retires to deliberate and returns into open court with its verdict in the form of a recommendation. This is a full scale jury trial in every sense of those terms. The defendant must surely feel that he is in "direct peril" of receiving the death penalty as he stands to receive the recommendation of the jury. *Cf., Green v. United States,* (1957) 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199.

The majority opinion concludes that the *Bullington* rationale does not apply to the Indiana situation because (1) the recommendation of the jury is not final and binding upon the sentencing judge, as was the case in Missouri, and (2) the recommendation does not necessarily reflect the jury's determination that the State failed in its burden to prove an aggravating circumstance. I cannot agree that these two distinctions rob the Indiana death sentencing hearing before a jury of its trial character and force. It must be evident that the jury recommendation against imposition of death will have a great and profound persuasive force in determining what choice the judge will make at final determination time. The jury recommendation must be unanimous. *Judy v. State,* (1981) Ind., 416 N.E.2d 95. It

is the personal judgment of twelve adult individuals of good will selected from a list comprised of a fair cross section of the community. The judge is also a member of that same community, sharing in its life and experience. The probability is very high that the judge, upon consideration of the recommendation will be brought to the brink of agreement with it in the very nature of things. The jury recommendation against death is so much like a binding decision, that constitutional protection against a second hearing before the judge on the propriety of death should be afforded. *Cf., Breed v. Jones,* (1975) 421 U.S. 519, 95 S.Ct. 1779, 44 L.Ed.2d 346.

I also cannot agree with the analysis made by the majority of the underlying bases of the jury recommendation of no death in distinguishing this case from *Bullington.* According to the Indiana statute:

"(e) . . . . The jury may recommend the death penalty only if it finds:

(1) That the state has proved beyond a reasonable doubt that at least one of the aggravating circumstances exists; and

(2) That any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances." Ind.Code § 35–50–2–9.

According to this statute, a jury recommendation of no death would have one of two necessary characteristics. Logically, it would either be based upon the jury's determination that the State had failed to establish historical facts constituting an aggravating circumstance, or it would be based upon the jury's determination that the evidence presented had established historical facts constituting some mitigating circumstance. In either event, the judge's later procedure to decide whether the death penalty should be imposed, using "the same standards that the jury was required to consider" would result in a retrial upon the same questions of fact and any decision of the judge to override a jury recommendation of no death including as in the present case his express finding of no mitigating circumstances, would necessarily resolve

one of those same questions of fact in a manner contrary to the manner in which the jury resolved it. Under our legal tradition, the determination of fact by a jury in favor of the defendant in a criminal case is not subject to being resolved at a later date by a judge in such a manner as to place the defendant in a worse position.

In the case of *United States v. DiFrancesco*, (1980) 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328, it is said:

"The exaltation of form over substance is to be avoided. The Court has said that in the double jeopardy context it is the substance of the action that is controlling, and not the label given that action." 449 U.S., at 142, 101 S.Ct., at 440.

Here the statutory label is "recommendation". The substance beneath it is a factual adjudication and moral judgment of the jury, not a court master, not a court commissioner, but a jury of twelve, that the human qualities which warrant imposition of the death penalty are not present in Thomas N. Schiro. This favorable jury determination was awarded in a fair and open adversarial confrontation with the prosecutorial forces of the State. Since that award came from a jury after a full-blown trial, a judge, applying the same rational and specific standards as the jury was required to use, cannot, consistent with the protection of the guarantee against double jeopardy, upon making contrary factual findings, take it away.

II.

The nunc pro tunc entry of the judge first notes that the verdict of the jury finding appellant Schiro guilty of murder while committing or attempting the crime of rape as charged in Count II was returned to court on September 13, 1981. The jury reconvened on September 15, 1981 and a death sentence hearing was held pursuant to Ind.Code § 35–50–2–9 resulting that day in a recommendation that the death penalty not be imposed. It further reflects a sentencing hearing was held on October 2, 1981, and continues in part pertinent to the judge's final determination that the sentence of death be imposed:

"On October 2, 1981, this Court having reviewed the evidence of the trial and having considered the written pre-sentence report, and having heard the arguments of counsel and the statement of the Defendant, gives the following reasons for the imposition of its death sentence.

These are the aggravating circumstances which the State has proved beyond a reasonable doubt. Under Indiana Code, Section 35–50–2–9, Subsection [1] The Aggravating circumstances alleged.

(b) The aggravating circumstances are as follows:

(1) The defendant committed the murder by intentionally killing the victim while committing or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape, or robbery.

1. The verdict of the jury on September 12, 1981, found the Defendant Thomas N. Schiro guilty of Murder while committing and attempting statutory rape.

2. The jury rejected the plea of insanity by its verdict.

Since aggravating circumstances were proven beyond a reasonable doubt, it remains to consider whether any mitigating circumstances exist and outweigh the aggravating circumstances.

As for mitigating circumstances, the Court finds none. Under Indiana Code § 35–50–2–9, subsection (c) the mitigating circumstances that may be considered under this section are as follows...."

At this point in the entry, the judge notes each mitigating circumstance and upon consideration of evidence rejects each possibility. After proceeding through that, the entry continues:

"Since the State proved 'beyond a reasonable doubt that existence of at least (1) of the aggravating circumstances alleged', (Indiana Code § 35–50–2–9, Section 9[9] ) and the Court finds no mitigating circumstances to outweigh it, the death sentence is required by the Stat-

utes of the State of Indiana. This Court has no choice but to follow the law.

The Defendant is to be executed, as by law provided, on the 28th day of January, 1982, before sunrise."

Indiana Code § 35–50–2–9, the death sentence statute, provides in pertinent part as follows:

"(a) The state may seek a death sentence for murder by alleging, on a page separate from the rest of the charging instrument, the existence of at least one of the aggravating circumstances listed in subsection (b) of this section. *In the sentencing hearing after a person is convicted of murder, the state must prove beyond a reasonable doubt the existence of at least one of the aggravating circumstances alleged.*

(b) The aggravating circumstances are as follows:

(1) The defendant committed the murder by intentionally killing the victim while committing or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape, or robbery.

\*　　\*　　\*　　\*　　\*　　\*

(c) The mitigating circumstances that may be considered under this section are as follows:

\*　　\*　　\*　　\*　　\*　　\*

(d) If the defendant was convicted of murder in a jury trial, the jury shall reconvene for the sentencing hearing; if the trial was to the court, or the judgment was entered on a guilty plea, the court alone shall conduct the sentencing hearing. The jury, or the court, may consider all the evidence introduced at the trial stage of the proceedings, together with new evidence presented at the sentencing hearing. The defendant may present any additional evidence relevant to:

(1) The aggravating circumstances alleged; or

(2) Any of the mitigating circumstances listed in subsection (c) of this section.

(e) If the hearing is by jury, the jury shall recommend to the court whether the death penalty should be imposed. The jury may recommend the death penalty only if it finds:

(1) That the state has proved beyond a reasonable doubt that at least one of the aggravating circumstances exists; and

(2) That any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances.
*The court shall make the final determination of the sentence, after considering the jury's recommendation, and the sentence shall be based on the same standards that the jury was required to consider. The court is not bound by the jury's recommendation."* (Emphasis added.)

Indiana Code § 35–50–2–9(e)(2) requires the sentencing judge to make the final determination of whether the death penalty should be imposed "based upon the same standards that the jury was required to consider." The standards referred to are the two listed in the same paragraph of the statute, the first of which is:

"(1) That the state has proved beyond a reasonable doubt that at least one of the aggravating circumstances exists; and"

The aggravating circumstance alleged in Count IIA is as follows:

"(1) The murder of Laura Luebbehusen charged in Count II was intentionally committed by the defendant, Thomas N. Schiro, during the commission of the crime of Rape, as more particularly described in the Information . . . ."

According to the requirements of these provisions, it was necessary for the sentencing judge to *personally* conclude as a trier of fact that the State, at the sentencing hearing before the jury, proved to a moral certainty beyond a reasonable doubt that Thomas Schiro strangled and thus killed Laura Luebbehusen while committing or attempting to commit a rape upon her, and at the time his mind had formed the *mens rea* identified by Ind.Code § 35–41–2–2 as "intentional", i.e., that he had had a conscious objective to strangle and kill. I can

find no direct statement in the judge's records and statement of reasons quoted above for imposing the death penalty that he *personally* reached this level of certainty upon each of these elements comprising the aggravating circumstance. Quite obviously, until the point in time is reached that the judge conducts his own sentencing hearing to finally determine the sentence, he has not been called upon to make a factual determination beyond a reasonable doubt of the existence of the aggravating circumstance. The fact that the jury may have done so on some of the same elements in arriving at its verdict of guilty and in rejecting the plea of insanity as noted by the judge, cannot supplant the judge's obligation to do so. This finding of an aggravating circumstance by the sentencing judge is at the very core and heart of the final determination that death is to be imposed. The sentencing judge has not communicated to this Supreme Court Justice that he arrived at that finding at the required level of certainty. For this reason also, I cannot vote to permit his final determination to stand.

PRENTICE, J., concurs in part with concurring and dissenting opinion.

PRENTICE, Justice, concurring and dissenting.

I concur in the result reached by the majority with respect to its affirmance of the conviction of the defendant (appellant). I dissent, however, with respect to its affirmance of the sentence of death.

### I.

I concur in part II of Justice DeBruler's dissenting opinion. The findings of the sentencing judge are devoid of any statement that he, himself, found, beyond a reasonable doubt from the evidence, that the defendant intentionally killed Laura Luebbehusen while committing or attempting to commit a rape upon her. I do not question that, under our standard for testing the sufficiency of the evidence upon appellate review, the evidence would have permitted such a finding, but it was not compelled. In the statement of his findings, the trial court judge correctly observed that one of the statutorily provided aggravating circumstances authorizing the imposition of a sentence of death is that the defendant committed murder by intentionally killing the victim. He proceeded to note, in particularity, that the jury had rejected Defendant's plea of insanity, and from this, he apparently concluded either that the jury had found, beyond a reasonable doubt, that the murder had been committed intentionally or that he was warranted in finding, beyond a reasonable doubt, from the jury's rejection of the insanity plea, that the murder had been committed intentionally. Neither would be correct.

Under the evidence, Defendant could have been found guilty of the crime charged whether he killed Laura Luebbehusen *intentionally* or knowingly or merely accidentally while committing or attempting to commit a rape. He was subject to the death penalty, however, only if he killed her *intentionally*. The interposition and rejection of the defense of insanity (mental disease or defect) Ind.Code § 35-41-3-6 (Burns 1979) simply has no relevance to the issue of whether or not the killing was done intentionally; yet, it is obvious that the trial court judge regarded it as significant, if not in fact controlling.

### II.

The trial court judge also misconstrued the statute, Ind.Code § 35-50-2-9 (Burns 1979), as a mandate to the judge to impose the death sentence in the event that an aggravating circumstance was found to exist, beyond a reasonable doubt, and that mitigating circumstances, if any, were outweighed by it. Clearly, the statute merely authorizes the imposition of the death sentence, under such circumstances.

Given the existence of one or more of the enumerated aggravating circumstances and the absence of any of the first six (6) mitigating circumstances enumerated under subsection (c) of the statute, the statute mandates neither a recommendation of death by the jury nor the imposition of the

death penalty by the judge. Subsection (e) provides that the standards employed by the jury and those employed by the judge be the same, and the seventh (7th) enumerated mitigating circumstance is entirely subjective, i.e., "(7) Any other circumstances appropriate for consideration." It permits unbridled discretion to spare defendants from the supreme penalty.

The majority has said, "The language of the trial court may appear awkward but nowhere has the trial court * * * attempted to apply anything resembling a mandatory death penalty." I emphatically disagree with this statement. The statement of the trial judge, for the most part, was a recitation of the death sentence statute and certain evidence supportive of the sentence. There is nothing contained in the statement of the trial judge, however, that acknowledges that it is he who has determined that the defendant should die. There is nothing contained in the statement to indicate that he understood that it was his burden, under the law, to determine whether the defendant should live or die. Rather, the entire tenor of the findings that closed with the statements, " * * * the death sentence is required by the Statutes of the State of Indiana. This Court has no choice but to follow the law.", reflects that the judge regarded himself as a mere conduit who had the unpleasant ministerial duty to announce a sentence fixed by statute.

The trial judge's comments amply demonstrate his misunderstanding of the standard he was required to apply in reaching the sentencing decision. Ind.Code § 35–50–2–9 affirmatively mandates the judge to employ the same standards that the jury was required to consider. That standard is stated as follows:

"The jury *may* recommend the death penalty only if it finds: * * *."

In *Hoskins v. State,* (1982) Ind., 441 N.E.2d 419, 430 (Prentice, J., joined by Hunter, J., concurring) I noted that this standard does not require the imposition of the death penalty under any circumstances whatsoever and that, "It is not altogether illogical to conclude, therefore, that although a juror

finds facts warranting the death penalty and no mitigating circumstances whatsoever, he *may,* nevertheless, recommend against imposing it without violating his oath." Similarly, the trial judge may refrain from imposing a sentence of death even though its imposition could not be held to be unreasonable under the circumstances. Moreover, it appears from the context of the judge's comments that, had he believed he had a choice, which he in fact did have under the statute, he would not have sentenced Defendant to death. The record reveals that the death sentence was imposed upon an erroneous standard. Consequently, the matter should be remanded for a new sentencing hearing. *State v. Watson,* (1982) La., 423 So.2d 1130, 1134–36.

In addition to being convinced that the sentence was imposed upon an erroneous standard, I am also convinced that the provisions of Ind.Code § 35–50–2–9, read in conjunction with Federal Due Process requirements concerning capital punishment, require the judge to give considerable weight to the jury's recommendation of mercy and this Court to review a death sentence, imposed contrary to the recommendation of the jury, upon a standard higher than a mere search for *manifest unreasonableness* as currently required under Ind.R.App.Rev.Sen. 2.

The nunc pro tunc order of February 23, 1983 does not state how the jury's recommendation was considered nor how much weight it was given by the judge.

The United States Supreme Court considers the jury "a significant and reliable objective index of contemporary values" with respect to the imposition of the death penalty. *Gregg v. Georgia,* (1976) 428 U.S. 153, 181, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859, 879 (plurality opinion of Stewart, J.); *Accord Brewer v. State,* (1981) Ind., 417 N.E.2d 889, 909. Our Legislature echoed these sentiments when it mandated the trial court to consider the jury's recommendation, Ind.Code § 35–50–2–9(e), and by allowing the jury to consider "any other circumstances appropriate for consideration." Ind.Code § 35–50–2–9(c)(7), as a mitigating

circumstance. In light of this acknowledged importance of the role of the jury, before a judge may impose a death sentence over a jury recommendation of no death sentence, that judge must articulate written findings, derived from clear and convincing evidence in the record, so that no reasonable person could differ with the determination. This standard, which has been utilized by the Supreme Court of Florida, *eg. Cannady v. State,* (1983) Fla., 427 So. 723, 732 (per curiam); *Tedder v. State,* (1975) Fla. 322 So.2d 908, 910 (per curiam), preserves the defendant's interests in having obtained a favorable jury recommendation after an adversary proceeding. *See Bullington v. Missouri,* (1981) 451 U.S. 430, 445–46, 101 S.Ct. 1852, 1861, 68 L.Ed.2d 270, 283. Any standard of less stringency detracts from the jury's contribution to the sentencing decision as recognized by the specific legislative directive that the judge consider the jury's recommendation. Given this command, and the statement of public policy that the death penalty is only discretionary even if all the requisite standards of proof are satisfied, in the case where the jury recommends mercy, the Legislature could not have intended that the judge merely disagree in order to override that recommendation. But for mere form, the trial judge may as well have discharged the jury upon receipt of the verdict upon the issue of guilt. It is clear that he either thought that the death sentence was required by law or that it was unalterably set in his mind. Hypothetically we could not accept a statement that proclaimed: "I find that the State has proven the existence of an aggravating circumstance authorizing a sentence of death, and I find no mitigating circumstances. I further find that the defendant, by erratic conduct during the trial, may have persuaded the jury to recommend mercy—or for reasons unknown, the jury may not be capable of rendering a rational recommendation upon the sentence determination. In any event, I have determined that a sentence of death is authorized by law, warranted by the circumstances and preferred by me. A recommendation of a life sentence by the jury would not alter my decision. I, therefore, dispense with the jury hearing upon the sentencing phase of this matter, and I now order a sentence of death." From a "due process" standpoint, the hypothetical is no more repugnant than the procedure and findings actually employed in this case.

I am also concerned that the trial judge has displayed an apparent misunderstanding of the term "mitigating circumstances," as used in the statute. I am drawn to this conclusion by his statements: "As for mitigating circumstances, the Court finds none.", and, " * * * and the Court finds no mitigating circumstances to outweigh it (the aggravating circumstance)." Whether or not there were mitigating circumstances of such weight as to create a conflict in the mind of a reasonable man upon a determination of the appropriate sentence is not a matter upon which I intend to imply an opinion. However, the record is replete with unrefuted evidence of circumstances which a reasonable man could not but weigh in the balance in making a decision of such gravity. In the main, I refer to the sordid evidence of the defendant's character, a paragon of revulsion which society simply cannot tolerate unfettered. This same evidence, however, also portrays a sick, rejected and tormented creature who, although legally accountable for his loathsome and despicable conduct is, himself, a victim of forces essentially beyond his control. Whether or not he should be permitted to live by reason of these circumstances, despite his vile crime, is a matter upon which reasonable minds may differ; but human decency, the statute (any other circumstances appropriate for consideration), and due process considerations require that they be weighed in the balance. The denial of the existence of any mitigating circumstances is indicative of the trial judge's misconception of his sentencing responsibility that is likely to have resulted in grievous error.

Additionally, the judge's unbridled discretion to reweigh the evidence under the same standards considered by the jury, which action I am not convinced occurred

here, potentially injects the same type of arbitrariness into the system which the Supreme Court has condemned. In cases where the judge and jury disagree, Florida's heightened standard of proof has been implicitly approved as an integral and significant factor in sustaining the constitutionality of the sentencing scheme. *Barclay v. Florida,* (1983) —— U.S. ——, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (plurality opinion); *Dobbert v. Florida,* (1977) 432 U.S. 282, 295–96, 97 S.Ct. 2290–2299, 53 L.Ed.2d 344, 357–58; *Proffitt v. Florida,* (1976) 428 U.S. 242, 249, 96 S.Ct. 2960, 2965, 49 L.Ed.2d 913, 921. In light of Ind.Code § 35–50–2–9 and the above cited authorities, I am compelled to conclude that this Court's failure to impose a heightened standard of proof upon a judge who seeks to override a jury recommendation of mercy runs afoul of Federal constitutional proscriptions concerning the due process required prior to imposition of the death penalty.

### III.

Upon Issue No. V in the majority opinion, I believe that the appropriate standard for authentication has not been provided.

"Anyone who is familiar with a person's writing from experience, having seen him write, or having carried on correspondence with him or from the opportunities of having frequently handled and observed the person's handwriting, is competent as a non-expert to give an opinion as to the genuiness of his signature or handwriting." *Spencer v. State,* (1958) 237 Ind. 622, 626, 147 N.E.2d 581, 583.

Dr. Abendroth testified that he had received three or four letters from Schiro, and he recalled some of their contents which he related to the court. He was also not equivocal about his ability to identify Defendant's handwriting nor to identify the exhibit at issue.

The majority appears to imply that, because Dr. Abendroth did not swear to knowledge of the origins of the first letters, he was not qualified to identify Defendant's handwriting. I do not understand the connection and note that in *Thomas v. State,* (1885) 103 Ind. 419, 427–29, 2 N.E. 808, 813–15, no such connection was required. Therein, though the witness produced ten letters, assertedly written by Defendant, before identifying the handwriting on the two letters, exhibits at issue, there was no testimony of how the witness knew that the accused had penned the first ten. Additionally, in this case, there is no showing that Mary Lee, whom the majority asserts could have provided the necessary authentication, did anything more than deliver the letter nor that she had any familiarity with Defendant's handwriting. Consequently, under the majority's ruling, in most cases, only the author of the letter would be able to authenticate it no matter how many times the witness, through whom a party sought to introduce the letter, had received letters from the author of the letter at issue. The law does not impose this onerous burden as the foundation for admitting a letter. *Thomas v. State, supra.*

However, the trial court has broad discretion in admitting or rejecting writings authenticated only by testimony of a witness who professes to recognize the author's handwriting. Thus, although I do not agree with the majority's conclusion that the letter was inadmissible, neither do I believe that the court committed error by rejecting it, as it was not required to accept Dr. Abendroth's testimony as a sufficiently reliable authentication.

I vote to affirm the trial court's judgment with respect to the conviction of Defendant but to vacate the death sentence and remand the case for a new sentencing hearing.