



FILED

May 17 2023, 11:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 20S-LW-620

## Joseph Albert Oberhansley,
*Appellant (Defendant below)*

—v—

## State of Indiana,
*Appellee (Plaintiff below).*

Argued: April 6, 2023 | Decided: May 17, 2023

Direct Appeal from the Clark Circuit Court
No. 10C04-1409-MR-1
The Honorable Vicki L. Carmichael, Judge

**Opinion by Justice Goff**

Chief Justice Rush and Justices Massa and Molter concur.

Justice Slaughter concurs in part.

**Goff, Justice.**

Joseph Albert Oberhansley was convicted of burglary and the murder of his former partner, Tammy Jo Blanton—crimes he concedes were "horrific and brutal."[1] The jury recommended, and the trial court imposed, a sentence of life imprisonment without the possibility of parole (LWOP). In this direct appeal, Oberhansley argues that the jury failed to determine that the aggravating circumstances outweighed the mitigating circumstances—a statutory prerequisite for an LWOP sentence. We conclude that the jury's LWOP recommendation implicitly reflected the necessary determination and, thus, the trial court did not err in imposing the sentence. Oberhansley also claims that his sentence was inappropriate in light of the severe mental illness he was suffering when he committed these crimes. Considering his character and the nature of his crimes, we cannot agree with him. Consequently, we affirm his sentence.

## Facts and Procedural History

Oberhansley's childhood in Utah was, by his own description, "good, or better than most." App. Vol. X, p. 35. Nevertheless, he accumulated a string of juvenile adjudications for acts including assaults and burglaries. When Oberhansley was sixteen, his half-brother and his father both died by suicide. At around age seventeen, Oberhansley had a son with his then-girlfriend. He shot his girlfriend and his mother a few days after the birth, killing his girlfriend. He also shot himself in the head during this incident. Oberhansley's suicide attempt left him with traumatic brain injuries. In 2000, he pled guilty to manslaughter and attempted murder. He served time in prison, during which he complained about hearing voices. In 2012, he was released on parole, which he transferred to Indiana, where he lived with family.

During his time in Indiana, Oberhansley's mental health struggles and trouble with the law continued. He was employed for a while at a car

---

[1] Oral Argument at 02:07–08.

dealership. But, in 2013, he was charged with strangulation and resisting law enforcement. In 2014, he reported to police that his family was trying to kill him and, when police officers found him driving recklessly, he attempted to evade them, leading to charges of criminal recklessness and resisting law enforcement. After being taken to a hospital because of his mental state, Oberhansley claimed the FBI was following him, he asked nurses to shoot him or give him a gun, he referred to himself as "Zeus," and he bit his own wrist. App. Vol. V, p. 81. A few days later, he was taken for inpatient psychiatric treatment, where he was prescribed medication. After bonding out of jail, he sought medical treatment once more and was found to be "paranoid and delusional." *Id.*

Meanwhile, Oberhansley had begun dating Tammy Jo Blanton. In June 2014, he moved into Blanton's home. It was evident to a coworker of Blanton that Oberhansley was mentally ill, as he was hearing voices, hallucinating, and saying he was a god. One Monday in September 2014, Blanton told the coworker that Oberhansley had assaulted her over the weekend. Blanton did not go home that Monday night, but ended her relationship with Oberhansley by text message, saying: "No one, and I mean no one, gets to terrify me the way [you] did on Sunday." Tr. Vol. VII, p. 212. She told him to take away his belongings and that the locks would be changed. The next day, Oberhansley visited Blanton at work, but left because Blanton did not want to talk with him. On the day after that, with new locks installed, Blanton returned to her home. Oberhansley tried to enter and retrieve his belongings, but Blanton did not let him in. Later, in the middle of the night, Blanton called the police, telling them that Oberhansley was trying to kick her door down. Jeffersonville Police Department Officer Brandon McGhee responded. Outside Blanton's home, he found Oberhansley complaining about not being able to get in. After talking with officers, Oberhansley agreed to leave the scene.

In the morning, Blanton did not show up for work. Her coworker called her again and again. Eventually, Oberhansley picked up, claiming to be Blanton's brother and saying that Blanton had gone to care for their father. Suspicious of this explanation, another coworker asked police to conduct a welfare check. Officers went to Blanton's home and knocked on the door. When Oberhansley opened it, he had a cut on his hand. A pat-down

search revealed a brass-knuckle knife in Oberhansley's pocket, which had hair and blood on it. Officer Connie Viers entered the home and found "blood everywhere, everywhere" in the bathroom and a "bloody mound" in the bathtub. Tr. Vol. V, p. 159. She also noted that the back door of the home had been forced. On closer inspection, Officer Viers and other officers discovered it was Blanton's body in the bathtub, under a shower curtain. There was a hole in Blanton's head and brain tissue falling out. Part of her skull lay by her knees. Blood was scattered around the house on and near various tools and cooking implements. In and around the kitchen sink were knives, cooking and eating utensils, and dirty plates with blood on them. Body tissues were found in a trash can under the sink. An autopsy found that Oberhansley had inflicted on Blanton twenty-five "sharp force injuries," including eight stab wounds. Tr. Vol. VII, p. 133. Several of them had been inflicted while Blanton was alive.

Officers arrested Oberhansley and interrogated him at the station. He spoke of "tingling," being "electrified," wanting to "restore the balance," and "Zeus" falling. Tr. Vol. VI, pp. 110–11, 180. At one point, he claimed that two "black guys" killed Blanton. *Id.* at 177–78. He said these men wanted to eat his brain and take the "third eye" from "the center of the forehead." *Id.* at 194. And he admitted eating part of Blanton's brain to get the "third eye." *Id.* at 212–13. In a later interrogation, Oberhansley also admitted eating Blanton's heart and mentioned "demons coming out." Tr. Vol. VII, pp. 4, 8.

The State, in its final amended information, charged Oberhansley with murder, Level 4 felony burglary, and Level 3 felony rape.[2] The State also requested the death penalty, alleging three statutory aggravating factors: the murder being intentionally committed during a burglary, the murder being intentionally committed during a rape, and the dismemberment of Blanton's body.[3] Before trial, Oberhansley was found incompetent to stand trial. After around nine months in a hospital, he was restored to

---

[2] *See* Ind. Code § 35-42-1-1 (2014); I.C. § 35-43-2-1(1); I.C. § 35-42-4-1.

[3] *See* I.C. §§ 35-50-2-9(b)(1)(B), (1)(F), (10).

competency. After a second suggestion of incompetence, he was found competent. Oberhansley initially filed a notice that he would plead the defense of insanity. However, the parties reached an agreement under which Oberhansley would withdraw his insanity defense and the State would seek LWOP instead of the death penalty. The trial court ordered that, because Oberhansley had withdrawn his insanity defense, he could not present any mental-health defense evidence in the guilt phase of the trial. A first trial ended in a mistrial. A second attempt to empanel a jury failed when insufficient jurors were available. Then, once more, Oberhansley was declared incompetent and his competency was again restored.

At the third trial, the jury found Oberhansley guilty of murder and burglary, but acquitted him of rape. During the LWOP sentencing phase, the State pointed to the evidence presented in the guilt phase and argued, as aggravating circumstances, that Oberhansley had committed murder while committing burglary and that he had dismembered Blanton's body. Oberhansley presented the testimony of two mental-health experts and claimed, as mitigating circumstances, that he had acted under extreme mental disturbance and that mental illness impaired his capacity to appreciate the criminality of his conduct or to conform his conduct to the law.

The trial court instructed the jury that, before it could recommend an LWOP sentence, it had to find one or both aggravating circumstances proven beyond a reasonable doubt and that any aggravating circumstances outweighed any mitigating circumstances. The jury was further instructed that the court would provide verdict forms. The purpose of these forms, the court advised, was threefold: first, to show whether the jury found each alleged aggravating circumstance proven; second, to show whether any aggravating circumstances it found outweighed the mitigating circumstances; and, third, to show whether it recommended LWOP or a term-of-years sentence. Despite these instructions, the jury did not receive a verdict form for the weighing of the aggravating and mitigating circumstances. The jury returned forms indicating it found both aggravating circumstances proven and recommending an LWOP sentence. The trial court noted verbally that the

jury had found the aggravating circumstances proven and recommended LWOP. At a sentencing hearing, the trial court found "sufficient evidence to support the jury's decision" and imposed an LWOP sentence. App. Vol. X, p. 59.

Oberhansley sought direct appeal to this Court. *See* Ind. Appellate Rule 4(A)(1)(a). Additional facts are discussed below as necessary.

## Standards of Review

As this Court stated in *Cardosi v. State*, another case concerning an LWOP sentence recommended by a jury, we recognize the trial court's "wide discretion in sentencing" and will reverse a sentence "'only upon a showing of a manifest abuse of that discretion.'" 128 N.E.3d 1277, 1289 (Ind. 2019) (quoting *Weisheit v. State*, 26 N.E.3d 3, 19 (Ind. 2015)).

When we review a sentence under Appellate Rule 7(B), we show the trial court "considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222 (Ind. 2008). This "deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense" and "the defendant's character." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).

## Discussion and Decision

Oberhansley argues that the jury, lacking the verdict form for weighing the aggravating and mitigating circumstances, failed to make a determination on this issue, and, thus, that the trial court lacked the authority to impose an LWOP sentence. He further claims that imposition of the LWOP sentence without the necessary jury finding violated his right to due process under the federal constitution. Oberhansley also seeks revision of his sentence, asserting that it was inappropriate because he committed his crimes due to severe mental illness.

While we reject the State's assertion that Oberhansley waived his claims of sentencing error, our review of the record convinces us that the jury did, in fact, make the necessary weighing determination. And reviewing

Oberhansley's sentence, we do not find compelling evidence casting his crimes or his character in a positive light. Consequently, we decline to revise his LWOP sentence.

## I. The jury's LWOP recommendation reflected its determination that the aggravating circumstances outweighed the mitigating circumstances.

When a defendant is convicted of murder after a trial by jury and the State seeks an LWOP or death sentence, the jury reconvenes for a sentencing hearing. Ind. Code § 35-50-2-9(d) (2014). The statute lists several "aggravating circumstances" which make defendants eligible for these penalties. *Ritchie v. State*, 809 N.E.2d 258, 265 (Ind. 2004) (citing I.C. § 35-50-2-9(b)). Before the jury may recommend LWOP, it must:

> (1) find at least one aggravating circumstance proven beyond a reasonable doubt, (2) provide a special verdict form for each aggravating circumstance alleged, and (3) find that the aggravating circumstances outweigh any mitigating circumstances.

*Pittman v. State*, 885 N.E.2d 1246, 1253 (Ind. 2008) (citing I.C. §§ 35-50-2-9(d), (e), (l)). The weighing determination is regarded as "essentially a discretionary function" of the jury, rather than as a "factual determination." *Id.* (citing *Ritchie*, 809 N.E.2d at 268). The statute does not require a special verdict form for the weighing determination. The jury's penalty recommendation is binding on the court "except where the traditional allocation of functions between judge and jury authorize or require the judge to set aside the jury's findings." *Id.*

Here, Oberhansley claims that the jury failed to take the third required step and find that the aggravating circumstances outweighed the mitigating circumstances. His argument comes down to the omission of a form that the trial court told the jury it must return. Oberhansley argues that the form in question was not given to the jury, that the jury did not manifest its weighing determination in any other manner, and, therefore, that the record does not show the jury found the aggravating

circumstances outweighed the mitigating circumstances. He raises this issue under two legal theories, alleging violation of the LWOP statute and deprivation of his liberty without due process.

## A. Oberhansley's claims of sentencing error are reviewable.

As a preliminary matter, we do not find that Oberhansley has waived his statutory or due process claims of sentencing error, as the State argues. The State's brief cites two cases in which this Court has found waiver of claims based on omitted verdict forms. In *Schiro v. State*, the defendant was convicted of murder while committing or attempting to commit rape. 451 N.E.2d 1047, 1049 (Ind. 1983). The trial court provided the jury with ten verdict forms, including forms for finding the defendant "Guilty of Murder/Rape," "Guilty of Murder but mentally ill," "Not Guilty," and more. *Id.* at 1062. On appeal, the defendant argued the trial court erred by failing to provide two other forms, including one for "Guilty of Murder while committing and attempting to commit rape, but mentally ill." *Id.* This Court held that there could be no reversible error based on the jury retiring "'without sufficient forms of verdict'" when the defendant failed to timely request the omitted forms. *Id.* at 1062–63 (quoting *Himes v. State*, 273 Ind. 416, 424, 403 N.E.2d 1377, 1382 (1980)). In *Pope v. State*, the defendant was convicted of two murders and other crimes. 737 N.E.2d 374, 376 (Ind. 2000). He argued that the trial court erred in failing to provide the jury with a penalty-phase verdict form "specifically advising that it could recommend the defendant be sentenced to a term of years even if the State carried its burden of proof." *Id.* at 380. This Court held the claim was waived because the defendant did not object to the verdict forms at trial. *Id.* (citations omitted).

Oberhansley's claims implicate a missing form, yet they differ subtly from the issues addressed in *Schiro* and *Pope*. Those cases involved the omission of forms for rendering verdicts **other than** those that were rendered. The defendants claimed, essentially, that if the forms had been provided, their juries might have reached different verdicts. Oberhansley, conversely, claims that his jury failed to return a form showing it made a

weighing determination that was an essential prerequisite for the LWOP sentence that was imposed. The omission of the form matters, he argues, because "nothing in the record reflects" that the jury made the necessary determination at all. Reply Br. at 9. As he puts it, "this is not an issue about verdict forms. It is an issue about findings – or rather, the lack thereof." *Id.* He is making claims of improper sentencing by the trial court, not simply prejudice from the omission of a verdict form.

It is an essential principle of appellate procedure that "a claim is not normally available for review on appeal unless first made at trial." *Kincaid v. State*, 837 N.E.2d 1008, 1010 (Ind. 2005). However, our precedents have carved out an exception, under which "[c]ounsel need not object to preserve a sentencing error for review." *Reed v. State*, 856 N.E.2d 1189, 1194 (Ind. 2006) (citing *Kincaid*, 837 N.E.2d at 1010). As this Court observed in *Kincaid*, we "review many claims of sentencing error"—*e.g.*, reliance on an improper aggravating circumstance or failure to consider a proper mitigating circumstance—"without insisting that the claim first be presented to the trial judge." 837 N.E.2d at 1010. *Kincaid* held that *Blakely* claims, asserting the Sixth Amendment right to trial by jury of facts that increase a maximum permissible sentence, may be raised for the first time in an appellant's initial brief. *Id.* (citing *Blakely v. Washington*, 542 U.S. 296 (2004)). And, in *Weisheit*, we reviewed on appeal a claim that an LWOP sentencing jury and trial court failed to consider and weigh the mitigating circumstances offered by the defendant. 26 N.E.3d at 20. Here, Oberhansley claims he was sentenced to LWOP without the prerequisite weighing determination having been made by the jury. Whether framed in statutory or due process terms, this claim of sentencing error bears a broad resemblance to the claims reviewed in *Kincaid* and *Weisheit*, which

also concerned the jury's role in sentencing. We will review the matter irrespective of preservation at the trial court level.[4]

## B. The record indicates that the jury made the necessary weighing determination.

Turning to the merits of the statutory issue, we are satisfied that the record shows the jury **did** make the required weighing determination. First, both the preliminary and final instructions to the jury repeatedly hammered the point that the jury could not recommend LWOP without finding that the aggravating circumstances outweighed the mitigating circumstances. App. Vol. IX, pp. 228–29, 239, 241, 247; App. Vol. X, p. 11. The instructions also specifically identified the statutory mitigating circumstances Oberhansley was asserting. App. Vol. IX, p. 237; App. Vol. X, p. 3. Oberhansley concedes that the jury was properly instructed. "When the jury is properly instructed, we will presume they followed such instructions." *Weisheit*, 26 N.E.3d at 20 (internal quotation marks omitted). To be sure, the jury might have asked the trial court to send in the missing form which it was instructed to return. But just because a jury does not expressly document every finding necessary to a verdict does not mean that those findings were not made. For example, a jury's failure to identify the mitigating circumstances it considered "does *not* mean" it failed to consider and weigh them. *Id.* Nor does the LWOP statute require a special verdict form for the weighing determination.

The record of the sentencing process relieves any lingering doubt as to whether the jury properly determined the issue. Oberhansley's case in the sentencing hearing was dedicated to showing that his mental illness

---

[4] We are mindful that LWOP sentences are largely "subject to the same statutory standards" as death sentences and, like the latter, trigger a "heightened-reliability interest." *Wright v. State*, 168 N.E.3d 244, 261 (Ind. 2021) (internal citations omitted). Regardless of a defendant's attempt to waive a sentencing appeal, "the death sentence cannot be imposed on anyone in this State until it has been reviewed by this Court and found to comport with the laws of this State and the principles of our state and federal constitutions." *Judy v. State*, 275 Ind. 145, 157–58, 416 N.E.2d 95, 102 (1981).

constituted mitigating circumstances. Tr. Vol. VIII, pp. 162, 181, 245–46. He offered expert testimony that his mental illness deprived him of the capacity to appreciate the criminal nature of his actions. *Id.* at 163, 229. The State, in its closing argument in the penalty phase, specifically asked the jury to weigh the aggravating and mitigating circumstances and to find that "these aggravators outweigh the mitigated factors of his mental illness." *Id.* at 237. All in all, we do not doubt that the jury was conscious of its duty to weigh the aggravating and mitigating circumstances, that it made the determination it had to make, and that its final recommendation of LWOP reflected this. The trial court did not manifestly abuse its discretion in imposing an LWOP sentence.

## C. Due process was satisfied because the jury made the determination required by statute.

Oberhansley claims that the trial court deprived him, without due process, of a "liberty interest" in not receiving an LWOP sentence "absent the jury finding required" by statute. Appellant's Br. at 34. He cites as authority *Hicks v. Oklahoma*, in which the Oklahoma courts denied the defendant the opportunity, required by state statute, to have a jury determine his sentence. 447 U.S. 343, 345 (1980). The United States Supreme Court held that, when a state leaves sentencing to the discretion of a jury, the defendant "has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion." *Id.* at 346. Under the Fourteenth Amendment, the Court explained, a defendant may not be arbitrarily deprived of this liberty interest without "due process of law." *Id.*

As in *Hicks*, Oberhansley had "a statutory right to have a jury fix his punishment in the first instance." *See id.* at 347. But here, unlike in *Hicks*, the issue **was** submitted to the jury. And we have already inferred from the instructions and the trial record that the jury did make the necessary weighing determination. Thus, Oberhansley's due process claim necessarily fails.

## II. The LWOP sentence is not inappropriate.

Oberhansley asks us to review and revise his sentence. We "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, [this] Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Ind. App. R. 7(B). "Whether we find a sentence inappropriate 'turns on myriad factors that come to light in a given case' and ultimately 'boils down to our collective sense of what is appropriate.'" *Stidham v. State*, 157 N.E.3d 1185, 1195 (Ind. 2020) (quoting *Taylor v. State*, 86 N.E.3d 157, 165 (Ind. 2017)). Our review is not limited to the aggravating and mitigating circumstances found by the factfinder below. *Id.* However, deference to the trial court prevails "unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson*, 29 N.E.3d at 122. Our principal concern is to "'leaven outliers rather than achieving a perceived correct sentence.'" *Stidham*, 157 N.E.3d at 1195 (quoting *Gibson v. State*, 51 N.E.3d 204, 215 (Ind. 2016)).

### A. The crimes involved extreme brutality and deviousness.

As to the nature of the murder in this case, Oberhansley himself characterizes it with these words: "Gruesome. Horrific. Brutal." Appellant's Br. at 43. His brief points to no aspects of his crimes which might alleviate their severity. Indeed, no "positive light" can be cast on them. The crimes, involving dismembering and eating parts of the victim's body, were extreme. They were inflicted on a frightened former partner who had locked Oberhansley out of her home. Like the murder, sexual assault, and dismemberment we reviewed in *Gibson v. State*, the offenses in this case were "beyond horrendous." *See* 43 N.E.3d 231, 241 (Ind. 2015).

We acknowledge the penalty-phase testimony indicating that Oberhansley was suffering an extreme mental disturbance and "could not appreciate" the criminal nature of his acts in Blanton's home. Tr. Vol. VIII,

p. 163. As this Court has stated previously, we "cannot foreclose the possibility" of considering for 7(B) purposes "the role of a defendant's mental illness in the commission of a crime." *Helsley v. State*, 43 N.E.3d 225, 229 (Ind. 2015). Yet, this case does not present the "exceptional and extraordinary circumstances" in which such consideration is warranted. *See id.* Although Oberhansley acted under delusions created by his mental illness, he "did not show restraint or a lack of brutality," nor "any regard for human life." *See id.*

Oberhansley also acted deviously. When he tried to visit Blanton at work he dressed like an employee, not in his usual clothes, and thus gained access to her workplace. During the crimes, he left his cellphone at his mother's house. He lied in an attempt to mislead friends who were worried for Blanton's safety. After being moved along by police from Blanton's home, he parked his car nearby and returned. And he lied to police, telling them that two "black guys" killed Blanton. Tr. Vol. VI, pp. 177–78. He maintained this fiction at trial. "[D]eceptive behavior" and efforts to "shift the blame" aggravate the nature of an offense. *See Washington v. State*, 902 N.E.2d 280, 292 (Ind. Ct. App. 2009). We find nothing on this point to justify revision.

## B. Oberhansley offers no record of positive character traits.

As to Oberhansley's character, we are presented with no evidence of virtues or examples of his goodness. We thus find a "lack of redeeming character traits" of a positive nature. *See Gibson*, 43 N.E.3d at 241. Certainly, he suffered the tragic loss of close family members during his youth. But, usually, "'evidence of a difficult childhood is entitled to little, if any, mitigating weight.'" *Wright v. State*, 168 N.E.3d 244, 269 (Ind. 2021) (quoting *Bethea v. State*, 983 N.E.2d 1134, 1141 (Ind. 2013)). The suicides of his father and half-brother may have marked a "significant turning point" in Oberhansley's life. *See* Appellant's Br. at 44. But this experience does not mitigate his subsequent record of violence against his own mother and intimate partners.

Oberhansley lives with a severe mental disorder that was affecting him at the time of his crimes. Yet, his juvenile record of delinquent acts goes

back to the time before his mental illness was first revealed. Likewise, his attack on his girlfriend and mother predated the first recorded signs of psychosis. Even worse, Oberhansley took methamphetamine on the day of those attacks. We cannot ignore the fact that Blanton is the second partner whom Oberhansley has killed and the third person he has attacked with deadly force. Oberhansley also had a strangulation charge and other charges pending when he committed his latest crimes. His "history of criminal conduct" weighs against relief. *See Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind. 2007), *clarified on other grounds on rehearing*, 875 N.E.2d 218 (Ind. 2007).

In short, neither the nature of Oberhansley's crimes nor the content of his character mark this case as an outlier warranting revision of his LWOP sentence.

# Conclusion

Oberhansley's penalty-phase jury determined, as required by statute, that the aggravating circumstances outweighed the mitigating circumstances. His LWOP sentence is not inappropriate. Consequently, the sentence is affirmed.

Rush, C.J., and Massa and Molter, JJ., concur.
Slaughter, J., concurs except as to footnote 4.

ATTORNEYS FOR APPELLANT
Cara Schaefer Wieneke
Brooklyn, Indiana

Victoria Bailey Casanova
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Kelly A. Loy
Office of the Attorney General
Indianapolis, Indiana